1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                              **DISTRICT OF NEVADA**

8   IGT, a Nevada Corporation,                )
                                              )
9                  Plaintiff,                 )
                                              )
10         v.                                 )        2:04-cv-01676-RCJ-RJJ
                                              )
11  ALLIANCE GAMING CORPORATION, a            )        **ORDER**
    Nevada Corporation; BALLY GAMING          )
12  INTERNATIONAL, INC., a Delaware           )
    Corporation; and BALLY GAMING, INC., a    )
13  Nevada Corporation d/b/a BALLY GAMING      )
    SYSTEMS,                                   )
14                                            )
                   Defendants.                )
15  _____  )
                                              )
16

17         Currently before the Court are the following motions: Plaintiff IGT's Motion for District Judge

18  to Reconsider Order Denying IGT's Motion for Summary Judgment on Defendants' Counterclaims

19  (#1001); Defendants Alliance Gaming Corporation, Bally Gaming Inc., and Bally Gaming International,

20  Inc.'s Motions for Summary Judgment of Invalidity of '891 Patent (#1002) and Summary Judgment as

21  to the Invalidity of '985 Patent (#1005). All motions have been opposed. Additionally, Defendants filed

22  a Motion to Strike or in the alternative Leave to File Sur-Reply (#1037) in response to the pleadings filed

23  regarding IGT's motion for reconsideration.

                              **BACKGROUND**

24         IGT is a global company specializing in the design, development, manufacturing, distribution,

25  and sales of computerized gaming machines and system products. Bally, one of IGT's chief competitors,

26  is a diversified, worldwide gaming company that designs, manufactures, operates, and distributes gaming

27  machines and computerized monitoring systems for gaming machines, owns and operates a significant

28  installed base of gaming machines, and owns and operates a casino.

1      On December 12, 2004, Plaintiff IGT filed with this Court a Complaint (#1) for patent

2  infringement against Defendants Alliance Gaming Corporation, Bally Gaming International, Inc., and

3  Bally Gaming Inc. (collectively referred to herein as "Bally"). In its Complaint, IGT alleged six separate

4  infringement counts for six different patents: Patent No. 6,827,646 ("646 patent"); Patent No. 5,848,932

5  ("932 patent"); Patent No. 5,788,573 ("573 patent"); Patent No. 5,722,891 ("891 patent"); Patent No.

6  6,712,698 ("698 patent"); and Patent No. 6,722,985 ("985 patent"). On January 21, 2005, Bally filed

7  its Answer and numerous counterclaims, including: (1) declaratory judgment of noninfringement,

8  invalidity, and unenforceability of the '646 Patent, '932 Patent, '573 Patent, '891 Patent, '698 Patent,

9  and '985 Patent; (2) monopolization and attempted monopolization of the gaming machine and wheel

10  game markets in violation of 15 U.S.C. § 2 and Nevada law; (3) violation of the Lanham Act; (4)

11  "Walker Process" violation; (5) violation of Nev. Rev. Stat. 598A.210; and (6) intentional interference

12  with prospective business advantage.

13      On October 16, 2008, the Court issued two Orders granting and denying various motions for

14  summary judgment. The Court found that IGT's patents '646 and '573 were invalid, and that Bally had

15  not infringed IGT's '646, '573, and '891 patents. (Order (#948)). The Court denied IGT's motion for

16  summary judgment as to Bally's antitrust and Lanham Act claims. Id. The Court further found that

17  IGT's '698 patent was invalid and that Bally had not infringed the '698 patent. (Order (#947)). IGT's

18  '985 patent was not declared invalid and the Court noted two issues which remained in the case: (1)

19  whether the '985 patent is invalid as obvious under 35 U.S.C. § 103, and (2) whether the Mcc iVIEWs

20  with player tracking devices infringe upon the '985 patent. Id.

21      Following this Court's issuance of the foregoing Orders, the Court issued a stay as to all

22  remaining proceedings and certified counts I through IV of the Complaint for appeal. The United States

23  Court of Appeals for the Federal Circuit affirmed the Court's Orders on October 22, 2009. (#983).

24  Subsequently, Bally moved the Court to lift the stay in the proceedings in order to proceed to trial on the

25  remaining issues before the Court. At oral argument on the motion to lift the stay, the Court indicated

26  that it intended to revisit whether there were matters for trial on the remaining issues in the case which

27  were previously raised in the motions for summary judgment (#998). The parties were invited to file

28  any additional briefs or renewed motions for summary judgment, if they wished to do so. Id.

1    Following the Court's hearing, IGT filed a motion to reconsider the Court's order denying

2    summary judgment on Bally's remaining counterclaims, and Bally's filed renewed motions for summary

3    judgment as to the invalidity of IGT's '891 and '985 patents.

**DISCUSSION**

4

5    **I.    IGT's Motion for District Judge to Reconsider Order Denying IGT's Motions for
         Summary Judgment on Defendants' Counterclaims (#1001)**

6

7         IGT brings a motion to reconsider this Court's orders denying IGT summary judgment on

8    Bally's antitrust counterclaims. (#1001). According to IGT, the Court should reconsider its prior

9    orders because the undisputed evidence and controlling case law justify summary judgment in its

10   favor on the counterclaims. IGT provides a compelling argument that the Court should reconsider its

11   prior rulings on the ground that "wheel games" do not constitute an antitrust relevant market. In

12   response, Bally states that the Court should not reconsider its prior rulings because there has been no

13   change in the applicable law or facts, and Bally has provided sufficient evidence to raise a triable

14   issue of fact regarding its claims.

**A. Discretion to Reconsider Prior Orders**

15        "An order denying a motion for summary judgment is generally interlocutory and 'subject to

16   reconsideration at any time.'" Preaseau v. Prudential Ins. Co., 591 F.2d 74, 79-80 (9th Cir.

17   1979)(internal citation omitted). A denial on a motion for summary judgment does not become "the

18   law of the case." Dessar v. Bank of Am. Nat. Trust and Sav. Ass'n, 353 F.2d 468, 470 (9th Cir.

19   1965); see also Noel v. Hall, 568 F.3d 743, 747 n.6 (9th Cir. 2009)("the district court did not abuse

20   its discretion here in departing from its earlier decision"). Thus, a trial court has broad discretion to

21   revisit motions it previously denied: "It is within the plenary power of the court to review its

22   interlocutory orders to afford such relief from them as justice requires." Wanamaker v. Columbian

23   Rope Co., 907 F.Supp. 522, 527 (N.D.N.Y. 1995).

24        In this matter, the Court exercises its discretion and reconsiders the orders previously entered

25   denying IGT summary judgment on the antitrust and Lanham Act counterclaims asserted against it.

26   As will be discussed in the following, the Court finds that there are no genuine issues of material fact

27   for trial, and summary judgment is appropriate.

28

3

**B. Sherman Act and Related Claims**

IGT argues that proof of a relevant market is required for all of Bally's antitrust counterclaims. According to IGT, Bally argues that the relevant market in this case is for wheel slot machines, as distinct from square slot machines or tower slot machines. IGT argues that wheel slot machines, or wheel games, do not constitute a distinct relevant market for purposes of antitrust litigation. IGT asserts that the classification of a relevant "wheel game" market is legally deficient because it excludes reasonably interchangeable products. Because Bally has failed to provide sufficient evidence to establish a relevant market, IGT states that Bally's antitrust counterclaims must be dismissed.

In response, Bally argues that there is substantial evidence that wheel games are a relevant market. According to Bally, wheel games constitute a separate and distinct relevant market from non-wheel games because competition from Bally in this market forced IGT to lower its prices for wheel games. In addition, Bally argues that game players, IGT and casinos all view wheel games as a separate economic entity from other slot machines. Bally asserts that "[s]ome game players" have a preference for wheel games over non-wheel games, and that casinos allocate a specific percentage of their floor space to wheel games. Finally, Bally states that the existence of some competition between wheel and non-wheel games does not prevent wheel games from being a relevant market.

In the Court's Order (#948) initially denying IGT's motion for summary judgment on this claim, the Court held that Bally's provided evidence that there are genuine issues of fact on the issue of whether wheel games are a distinct relevant antitrust market. (Order (#948) at 67). Upon reconsideration of this ruling, the Court now finds that IGT is entitled to summary judgment on Bally's counterclaims because wheel games do not, on their own, constitute a relevant antitrust market.

In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a "relevant market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008). "That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." Id. Absence of a relevant market necessarily disposes of antitrust claims. See e.g. Spectrum Sports, inc. v. McQuillan, 506 U.S. 447,

4

113 S.Ct. 884 (1993).

The relevant market "one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration." United States v. E.I. dupont de Nemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994 (1956). A relevant market "is composed of products that have reasonable interchangeability for the purposes for which they are produced - price, use and qualities considered." Id. The relevant market "must be a product market."[1] Newcal Industries, 513 F.3d at 1045. "The consumers do not define the boundaries of the market; the products or producers do." Id. (citing Brown Shoe v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502 (1962)).

The relevant market "must encompass the product at issue as well as all economic substitutes for the product." Id. As the Supreme Court has instructed, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Id. (quoting Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502). Although the general market must include all economic substitutes, "it is legally permissible to premise antitrust allegations on a submarket." Id. "That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a small part of the general market of substitutable products." Id. In order to establish the existence of a legally cognizable submarket, the plaintiff must show that the alleged submarket is economically distinct from the general product market. Id. In Brown Shoe, the Supreme Court listed several "practical indicia" of an economically distinct submarket: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. 1502.

In this matter, on reconsideration of its prior ruling, the Court finds that "wheel games," on their own, do not constitute an antitrust relevant market. Upon review of the evidence submitted and the arguments of both parties, it is not proper to divide the relevant market between wheel games and

---

[1] As noted by the Ninth Circuit in Newcal, antitrust law requires allegations of both a product market and geographic market. 513 F.3d at 1045. The geographic market is not at issue in this matter. Rather, the Court must determine whether "wheel games" create a viable product market.

1    non-wheel games in the slot machine context. As noted by IGT, such a differentiation is based solely

2    on the shape of the machine. The shape of a machine is an improper classification for purposes of

3    determining a relevant market because it does not relate to the characteristics, functions and uses of

4    the machine. In this regard, a game similar to a wheel game, except with a square shape rather than a

5    circular shape, would be in a separate relevant product market, even if the machines performed

6    functionally the same.

7         Second, the Court must abide by the rule that the relevant market must encompass the

8    product at issue as well as all economic substitutes for the product. As noted by IGT, it is undisputed

9    that the relevant functionality of gaming machines is revenue generation. The evidence provided

10   shows that casinos choose between gaming options, including gaming machines, based on their net

11   revenue potential and performance - not by their shape. In this matter, economic substitutes for the

12   Wheel of Fortune game include gaming machines of different shapes and sizes. For instance,

13   WMS's Monopoly game machine competes against wheel games. (#1027 at 10 n. 3). Thus, the

14   Court finds that creating a relevant market based on wheel games is inappropriate. It would be more

15   appropriate to consider gaming machines that generate revenue, regardless of their shape, because

16   gaming machines that fail to generate substantial profit will not survive against gaming machines

17   that do. Conversely, gaming machines that generate comparable amounts of revenue will compete

18   with each other, whether the gaming machines are wheel bonus, reel bonus, tower bonus or no

19   bonus.

20        As noted in the foregoing, a relevant market is composed of products that have reasonable

21   interchangeability for the purposes for which they are produced - price, use and qualities considered.

22   In this matter, the relevant market is significantly broader than "wheel games" because there is ample

23   evidence that non-wheel games compete with wheel games. Bally concedes that there is "some

24   competition between wheel and non-wheel games" but asserts that such competition does not

25   prevent wheel games from being a relevant market. However, the Court finds this argument without

26   merit. As noted in the foregoing, it is undisputed that casinos mix and match products to maximize

27   floor-space revenue generation. By limiting the relevant market to "wheel games," the Court would

28   not be including all reasonably interchangeable products in the market. As noted by IGT, the

evidence shows that wheel games compete with all gaming machines.  Because all gaming machines compete, wheel games are not an economically distinct relevant market.

Thus, based on the foregoing, the Court finds that, in reconsideration of its previous orders, "wheel games," on their own, do not constitute a relevant market for purposes of antitrust litigation. Because wheel games do not constitute a relevant market, IGT is entitled to summary judgment on the antitrust counterclaims asserted against it.

**C.  Lanham Act**

In addition to the foregoing, the Court also reconsiders its orders denying summary judgment on Bally's Lanham Act claim.  The elements of a claim under § 43(a) of the Lanham Act are that: (1) the defendant made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or services; (2) the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant caused the statement to enter interstate commerce; and (5) the statement results in actual or probable injury to the plaintiff.  See Zenith Elec. Corp. v. Exzec, Inc., 182 F. 3d 1340, 1348 (Fed. Cir. 1999).

The Court initially held that Bally had created issues of fact as to whether IGT made a false statement of material fact regarding the lawsuit, whether the disputed IGT statements actually deceived or had a tendency to deceive the public, and whether IGT's statements injured Bally. (Order (#387)).  However, upon reconsideration, the Court finds that there is no question of fact on the issue of whether Bally suffered injury due to IGT's statements and therefore grants IGT summary judgment on this claim.

To raise a question of fact, Bally stated that at least one of its customers, Multimedia Games, allegedly backed out of an order with Bally as a result of the pending IGT litigation.  (Order (#387) at 25).  IGT countered by introducing evidence implying that Bally actually breached the contract with Multimedia Games and cancelled the contract unilaterally.  Id.  In this regard, IGT provided evidence that the decision to end the relationship with Multimedia Games was mutual, and was motivated by other business decisions.  (#1001 at 19).

Although the cause of the termination of the relationship because Bally and Multimedia

1   Games is in dispute, the Court finds that there is still no genuine issue of fact for trial on this claim.
2   In this regard, the Court finds that Bally has failed to provide evidence that Multimedia Games based
3   its alleged decision to terminate its relationship with Bally (or terminate an order through Bally) on
4   the press release issued by IGT.  In this regard, Bally provided evidence that Multimedia Games did
5   not want to order certain products from Bally because of "too much legal baggage with IGT wheel
6   patent."  Although this evidence shows that Multimedia Games may have been concerned with the
7   litigation involved in this matter, it does not connect Multimedia Games' decision to the actual press
8   release at issue in Bally's Lanham Act claim.  As noted, to recover under the Lanham Act, Bally
9   must show that the "statement" not only deceived the intended audience, but also that the
10  "statement" resulted in injury to Bally.  Thus, the alleged lost sale between Bally and Multimedia
11  Games must flow from the false or misleading "statement" made by IGT - specifically the press
12  release at issue.  However, Bally has provided no evidence that it lost the sale to Multimedia Games
13  specifically because of the press release.

14       Finally, in addition to the evidence supporting IGT's claim that its press release did not end
15  the relationship between Bally and Multimedia Games, Bally's does not refute that its sales have
16  been increasing since the issuance of the IGT press release.

17       Thus, based on the record before the Court, the Court finds that its previous orders denying
18  summary judgment on Bally's Lanham Act claim were in error.  Summary judgment is appropriate
19  on this claim because Bally has failed to show that it was actually or potentially injured by the IGT
20  press release.

21  **D. Conclusion**

22       Based on the foregoing, the Court finds that summary judgment on Bally's antitrust and
23  Lanham Act counterclaims is warranted.  Upon reconsideration, the Court finds that there is no
24  genuine issue of fact for trial, and IGT is entitled to judgment as a matter of law.[2]

25  **II.    Bally's Motion for Summary Judgment as to the '985 Patent (#1005)**

26       Bally moves for summary judgment of invalidity of U.S. Patent No. 6,722,985 for lack of

27

28      [2] In addition to the foregoing, Bally filed a Motion to Strike (#1037) seeking to strike arguments
    raised for the first time in IGT's reply brief.  That motion is GRANTED.

enablement. (Mot. for Summary Judgment (#1005)).  According to Bally, there is no need for trial on the issue of whether the Bally Mcc iVIEWS infringe U.S. Patent No. 6,722,985 ("the '985 patent") as the Court has already concluded that the patent is invalid.  (#1006 at 3).

On November 16, 2007, IGT moved the Court for summary judgment on the issue of whether the '985 patent was infringed and valid.  Bally opposed the motion and argued that the '985 patent was invalid for lack of enablement.  In the summary judgment order, the Court agreed with Bally, concluding that the '985 patent was not enabled, but, because Bally did not affirmatively move for summary judgment on that issue, the Court merely denied IGT's motion for summary judgment rather than declaring the '985 patent invalid as a matter of law.  See (Order (#947) at 41).  Now, Bally moves for summary judgment on the invalidity of the '985 patent for lack of enablement on the grounds of the Court's previous holding.

In response, IGT argues that summary judgment should not be granted in Bally's favor because there has been no finding of invalidity due to lack of enablement by the Court.  (Opp. (#1014) at 3).  IGT argues that Bally mischaracterizes the Court's prior ruling because that order did not hold that the '985 patent was invalid, but merely denied IGT's motion for summary judgment on the issue of validity.  Id.  Rather, IGT states that summary judgment should be granted on its behalf because the '985 patent is enabled and valid.

Under the Patent Act, each issued patent claim is presumptively valid.  Mkt. Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1378 (Fed. Cir. 2009).  35 U.S.C. § 112 provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor for carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112.  A lack of enablement is grounds for a patent to be declared invalid.  AK Steel Corp. v. Sollac and Ugine, 344 F.3d 1234, 1245 (Fed. Cir. 2003)(affirming judgment of invalidity of patent claims on the grounds that they were not enabled).

A patent is enabled when the specification sufficiently describes the manner and process of

1   making and using the invention so as to enable a person of skill in the art to make and use the full

2   scope of the invention without experimentation. AK Steel Corp., 344 F.3d at 1244. "Whether undue

3   experimentation is needed is not a single, simple factual determination, but rather is a conclusion

4   reached by weighing many factual considerations." Warner-Lambert Co. v. Teva Pharm. USA, Inc.,

5   413 F.3d 1326, 1337 (quoting In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988)).

6       In the Court's prior order, the Court concluded that the '985 patent "is not enabled." (Order

7   (#947 at 41)). That ruling was found on a motion for summary judgment filed by IGT that the '985

8   patent was infringed and valid. Bally opposed IGT's motion and argued that the '985 patent was

9   invalid for lack of enablement. Notably, Bally did not move for summary judgment, at that time, on

10  its lack of enablement claim as to '985.

11      The '985 patent is titled "Universal Player Tracking System" and, according to the

12  specification, "the player tracking units, 230, 235, 240, of the present invention, may be configured

13  to communicate with the three types of player tracking servers above, as well as many other types of

14  player tracking servers without replacing the player tracking hardware." (Mot. for Summary

15  Judgment (#1006) at 3). Thus, the '985 patent purports to disclose a player tracking unit that can

16  communicate with different types of player tracking servers merely "by reconfiguring software" - i.e.

17  "without replacing the player tracking hardware." Id.

18      As noted in the foregoing, following the briefing and hearing on IGT's motion for summary

19  judgment on this issue, the Court denied the motion and concluded that the '985 patent was not

20  enabled. In this regard, the Court found that the specification would not enable a person of skill in

21  the art to practice the "memory arranged" element of the asserted claims without undue

22  experimentation. The "memory arranged" element is as follows:

23          a memory arranged to store a plurality of different communication protocols allowing
            the logic device to communicate with a plurality of different types of gaming
24          machines using different communication protocols to communicate with the player
            tracking unit and a plurality of different types of player tracking servers using
25          different communication protocols to communicate with the player tracking unit . . . .

26  Id. The Court recognized that this element requires that the player tracking unit be able to

27  communicate with different types of gaming machines and player tracking servers using

28  "communication protocols." Id. The Court further recognized that the parties had stipulated that

                                                    10.

1    "communication protocols" means "a set of rules that enable the transfer of information between

2    devices." Id. The Court found that these "rules" require electrical and hardware layers, as well as

3    software. Id. The Court provided the following analysis:

4        IGT's expert witness agreed that electrical and hardware layers are part of the "rules
         that enable the transfer of information between devices." See, e.g., Opp. Delk Decl.,
5        Ex. 2 at 172: 16-22, 230: 8-231:15, 232:23-233:8. IGT's attempt to limit the
         communication protocol's definition to software only runs contrary to its own expert
6        witness' concession that the physical and electrical layers are also a necessary part of
         the reconfiguration. Id. It is undisputed that if two devices attempting to
7        communicate do not follow the same electrical and hardware rules, they will be
         unable to do so. See, e.g., Opp. Delk Decl., Ex. 2 at 172: 16-22, 230: 8-231: 15,
8        232:23-233:8. Without teaching how to reconfigure the software and hardware so
         that the player tracking unit connected to the server could communicate with the
9        server, the '985 patent is not enabled.

10   Id.

11       It appears from IGT's opposition to Bally's motion for summary judgment on this issue that

12   it is seeking reconsideration of this Court's prior ruling. However, the Court will not reconsider its

13   ruling that patent '985 is not enabled. Rather, the Court adopts the foregoing analysis and finds that

14   the '985 patent is invalid as not enabled.

15       Based on the foregoing, Bally's motion for summary judgment of invalidity of U.S. Patent

16   No. 6,722,985 for lack of enablement is granted.

17   **III.    Bally's Motion for Summary Judgment as to the '891 Patent (#1002)**

18       Bally has also moved for summary judgment on its claim of invalidity of U.S. Patent No.

19   5,722,891. (Mot. for Summary Judgment (#1002)). On October 16, 2008, the Court granted Bally's

20   motion for summary judgment of noninfringement of the '891 patent, finding that the only games

21   accused by IGT of infringing that patent lacked all three of the '891 claim limitations in dispute -

22   "specific reel," "bonus game," and "normal wins, specific wins, and bonus wins" - regardless of

23   whether analyzed literally or under the doctrine of equivalents. (Order (#948) at pp. 20-26).

24   Although the Court found that Bally did not infringe IGT's '891 patent, Bally now requests that this

25   Court retain jurisdiction over Bally's declaratory judgment counterclaim for invalidity of the '891

26   patent and grant Bally's motion for summary judgment on this counterclaim.

27       IGT filed an opposition stating that Bally's counterclaim alleging invalidity of the '891 patent

28   is moot following the Court's order finding noninfringement of that patent. IGT argues that any

determination on the invalidity counterclaim would be a "completely unnecessary advisory ruling." (Opp. to Mot. for Summary Judgment (#1016) at 2). In addition, IGT states that if the Court finds that the validity of the '891 patent is not moot, IGT agrees to grant Bally "a reasonable license or covenant not to sue on the '891 patent for any and all future conduct, since IGT agrees with the Court that no issues should remain to be tried in this case." Id. at 4.

Here, the Court finds that although the counterclaim relating to the invalidity of '891 is not moot, the Court lacks jurisdiction to decide the issue based on IGT's covenant not to sue. In Liquid Dynamics Corp. v. Vaughn Co., Inc., the Federal Circuit held that "[a] district judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion." 355 F.3d 1361, 1371 (Fed. Cir. 2004). In this matter, based on the time and expense already extended by the parties, the Court would normally exercise its discretion and decide the invalidity counterclaim. However, because IGT has offered a covenant not to sue Bally for infringement of that patent, the Court is divested of subject matter jurisdiction over this counterclaim.[3]

In Dow Jones & Co. v. Blaise Ltd., the Federal Circuit held that a patent owners' offer of a covenant not to sue divested the court of subject matter jurisdiction over the suit for declaratory judgment of invalidity of the patent. 606 F.3d 1338, 1345-49 (Fed. Cir. 2010). In that case, the court found that because Blaise's covenant not to sue avowed that Blaise would not sue Dow Jones for any acts of infringement of its '530 patent, the covenant "therefore extinguished any current or future case or controversy between the parties, and divested the district court of subject matter jurisdiction." Id. at 1348. That court noted the extensive discovery and litigation history of the case. However, it held that "[s]ubject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or

---

[3] In its Opposition, IGT offers a covenant not to sue Bally "for patent infringement under the '891 patent, arising from activities and/or products occurring on or before the date the Federal Circuit summarily affirmed this Court's orders granting summary judgment of noninfringement - October 22, 2009." (Opp. (#1016) at 4). IGT further offers that if the '891 validity issue is not held to be moot but all other issues are resolved through the current briefing process, (which they are), IGT offers Bally a "covenant not to sue on the '891 patent for any and all future conduct." Id.

controversy." Id.

Subject matter jurisdiction in a declaratory judgment suit depends upon the existence of "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," and the plaintiff bears the burden of proving the existence of such a controversy throughout the litigation. Id. (quoting Madwoman, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007)(internal quotations and citations omitted)). According to the Supreme Court, "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. (quoting Madwoman, 549 U.S. at 127, 127 S.Ct. 764).

Based on the Federal Circuit's holding in Blaise, the Court finds that the covenant not to sue offered by IGT extinguishes the controversy between Bally and IGT and divests this Court of subject matter jurisdiction. Because IGT has offered not to sue for patent infringement under the '891 patent, Bally has failed to show, under the circumstances, that there is a substantial controversy between the parties, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Thus, this claim is dismissed.

///
///
///
///
///
///
///
///
///

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that IGT's Motion for District Judge to Reconsider Order (#1001) is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment of Invalidity of '891 Patent (#1002) is DENIED.  That claim is dismissed based on the grounds of lack of subject matter jurisdiction.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment of Invalidity of '985 Patent (#1005) is GRANTED.

The Clerk of the Court shall enter Judgment accordingly.


DATED: This 29th day of November, 2010.

United States District Judge